IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO. 5:24-CV-00203-SCR

| | |
|---|---|
| CANDICE L. FAUBLE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM AND ORDER** |
| ) | |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

**THIS MATTER** is before the Court on "Plaintiff's Social Security Brief" (Doc. No. 6) and "Defendant's Brief" (Doc. No. 9).[1]

The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and the matter is ripe for disposition.

The Court finds that Defendant's decision to deny Plaintiff Social Security benefits is supported by substantial evidence. Accordingly, the Court will <u>affirm</u> the Commissioner's decision.

**I. PROCEDURAL HISTORY**

The Court adopts the procedural history as stated in the parties' briefs and discusses relevant portions below.

---

[1] Following amendments to the Supplemental Rules for Social Security Actions, 42 U.S.C. § 405(g), and Local Civil Rule 7.2, the parties are no longer required to file dispositive motions. Plaintiff elected not to file a Reply brief.

Plaintiff filed the present action on September 16, 2024. She assigns error to the Administrative Law Judge's ("ALJ") formulation of her mental Residual Functional Capacity ("RFC"),[2] specifically arguing that the "ALJ failed to account for the 'total limiting effects' of Plaintiff's severe mental impairments. . . ." (Doc. No. 6 at 1, 3). Specifically, as subcomponents of that assignment of error, Plaintiff argues that the "medical opinions at issue and Plaintiff's statements patently support greater limitations than the ALJ's RFC," id. at 12, that the ALJ improperly analyzed the opinions of consultant-psychologists Drs. Grover and Bradley and treating therapist Dantzler, id. at 8, 12-15, and that the ALJ's analysis was deficient regarding Plaintiff's subjective complaints. Id. at 15-16.

As to the RFC for Plaintiff, the ALJ wrote:

**After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except as follows. The claimant can occasionally perform postural activities but must avoid workplace hazards. She can frequently, but not continuously, use the bilateral upper and lower extremities for pushing, pulling, and operating hand and foot controls. She can sustain attention and concentration for two hours at a time. She can understand, remember, and carry out short but uninvolved instructions to perform routine, repetitive tasks, but she cannot perform work requiring a production rate or demand pace. She can frequently, but not continuously, be required to read printed materials. She can have frequent, but not continuous, contact or interactions with supervisors, occasional contact or interactions with coworkers, and no public contact or interactions. She should avoid work environments with constant changes in a routine setting.**

---

[2] The Social Security Regulations define "Residual Functional Capacity" as "the most [a claimant] can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] [R]esidual [F]unctional [C]apacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The agency's regulations establish a five-step sequential evaluation, by which the Commissioner considers, in sequence, whether a claimant: (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the severity of a listed impairment, (4) can return to his past relevant work, and (5) if not, whether he can perform other work. 20 C.F.R. § 404.1520(a)(4)(i)-(iv). Between steps three and four, the claimant's residual functional capacity is evaluated. 20 C.F.R. § 404.1545(a)(1).

(Tr. 84) (bolding in original).³ The ALJ found that Plaintiff had no past relevant work, was 43 years-old when she filed her application, and had at least a high school education. (Tr. 93). Based on the Vocational Expert's testimony given in response to a hypothetical including the RFC's limitations, the ALJ then found Plaintiff could perform other work existing in the national economy and was not disabled. (Tr. 93-95).

## II. DISCUSSION

The Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the Commissioner applied the correct legal standards. Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); Biestek v. Berryhill, 587 U.S. 97, 102-03 (2019); Oakes v. Kijakazi, 70 F.4th 207, 212 (4th Cir. 2023); Arakas v. Comm'r of Soc. Sec., 983 F.3d 83, 94 (4th Cir. 2020). "Substantial evidence is 'more than a mere scintilla' and '[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Oakes, 70 F.4th at 212 (quoting Biestek, 587 U.S. at 103). "The threshold is 'not high' and defers to the ALJ, 'who has seen the hearing up close.'" Id. (quoting Biestek, 587 U.S. at 103, 108). "'In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for the ALJ's.'" Id. (citing Arakas, 983 F.3d at 95). "But 'even under this deferential standard, we do not reflexively rubber-stamp an ALJ's findings.'" Id. (quoting Lewis v. Berryhill, 858 F.3d 858, 870 (4th Cir. 2017)).

---

³ As discussed above, Plaintiff challenges only the RFC as to her mental limitations, not physical limitations. (Doc. No. 6 at n 3). Any challenges not set forth in Plaintiff's opening brief are waived. Grayson O Co. v. Agadir Int'l LLC, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue.") (internal quotation omitted and brackets removed).

"To pass muster, ALJs must build an accurate and logical bridge from the evidence to their conclusions." Id.; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (finding the ALJ failed to build an accurate and logical bridge from the evidence to his conclusion); Patterson v. Comm'r of Soc. Sec., 846 F.3d 656, 663 (4th Cir. 2017)). In Patterson, the Court explained:

> We do not take a position on the merits of [Plaintiff's] application for disability benefits. Instead, the dispute here arises from a problem that has become all too common among administrative decisions challenged in this court—a problem decision makers could avoid by following the admonition they have no doubt heard since their grade-school math classes: Show your work. The ALJ did not do so here, and this error rendered his decision unreviewable.

846 F.3d at 663 (citing Kohler v. Astrue, 546 F.3d 260, 267 (2d Cir. 2008)).

The question before the ALJ was whether Plaintiff became disabled at any time.[4] The ALJ is responsible for assessing a claimant's RFC. See 20 C.F.R. §§ 404.1546(c), 416.946(c). In making that assessment, the ALJ must consider the functional limitations and restrictions resulting from the claimant's medically determinable impairments. See Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR96-8p, 1996 WL 374184 (July 2, 1996). The ALJ also must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts. . . and nonmedical evidence." Id. at *7.

SSR 96-8p explicitly directs:

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may

---

[4] The term "disability" is defined as the:
> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . [.]

42 U.S.C. § 423(d)(1)(A); see also Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

Id.

Plaintiff has the burden of establishing her RFC by showing how her impairments affect her functioning. See 20 C.F.R. §§ 404.1512(a) & 416.912(a); see also, e.g., Plummer v. Astrue, No. 5:11-cv-06-RLV-DSC, 2011 WL 7938431, at *5 (W.D.N.C. Sept. 26, 2011) ("[t]he claimant bears the burden of providing evidence establishing the degree to which her impairments limit her RFC"), mem. and recommendation adopted, 2012 WL 1858844 (May 22, 2012), aff'd, 487 F. App'x 795 (4th Cir. Nov. 6, 2012).

In Mascio, the Fourth Circuit observed "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)); see also Thomas v. Berryhill, 916 F.3d 307, 311 (4th Cir. 2019) ("ALJ's analysis of [plaintiff's] RFC contains too little logical explanation for us to conduct meaningful appellate review").

Here, the ALJ thoroughly discussed the record. Indeed, the hearing decision could fairly be described as exhaustive. (Tr. 75-95). Substantial evidence supports the ALJ's finding that despite Plaintiff's impairments, she remained capable of a range of light work involving short, uninvolved instructions, routine repetitive tasks, maintaining concentration, persistence, and pace for two-hour periods in a normal workday, with limited interaction with supervisors, coworkers (but not the public), in a work setting that did not constantly change. (Tr. 84). The ALJ's decision explained why those limitations accounted for Plaintiff's difficulties associated with her mental impairments and is supported by substantial evidence.

In her first argument, Plaintiff contends the evidence supports "far greater and more detailed limitations than the ALJ's RFC finding." (Doc. No. 6 at 12). At the outset, the Court notes that nowhere does Plaintiff argue or even suggest what specific additional limitations the ALJ should have imposed. See, e.g., Kimberly B.C. v. Kijakazi, No. 22-617, 2023 WL 4974033, at *6 (M.D.N.C. Aug. 3, 2023) (affirming where plaintiff did not identify any functional limitations the ALJ should have included in the RFC); Mary R. v. Saul, No. 3:19-cv-903, 2021 WL 388463, at *4–5 (E.D. Va. Jan. 19, 2021) (noting remand is not warranted where plaintiff did not identify any additional functional limitations that would result in a change to her RFC other than those already identified by the ALJ), report and recommendation adopted, 2021 WL 377191 (E.D. Va. Feb. 3, 2021).

Moreover, contrary to Plaintiff's argument, the ALJ did not unduly discount Plaintiff's mental impairments. Rather, the ALJ included several mental functional limitations in the RFC finding that fully addressed the step-two finding of "moderate" mental ratings in each of the four broad functional categories. (Tr. 81-93).[5] The ALJ considered Plaintiff's statements and testimony, treatment records, a medical opinion from a former mental health provider, and the prior administrative medical findings from two State agency psychological experts. (Tr. 84-93). In her RFC assessment, the ALJ noted Plaintiff's reports and testimony of slow learning and difficulty understanding directions and forms; but as the ALJ pointed out, she also stated she could pay attention up to an hour at a time and follow instructions if they are not complicated. (Tr. 84-85, citing Tr. 236, 241). She also reported being bothered by other people and not handling stress and changes in routine well. (Tr. 84-85, citing Tr. 236, 242). While she reported that she lived

---

[5]A "moderate" rating is not itself part of the residual functional capacity finding. Rather, a "moderate" rating in a category of mental functioning at steps two and three of the sequential valuation is indicative of a "fair" ability to "independently, appropriately, [and] effectively" function in that area "on a sustained basis." 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00(F)(2)(c).

with and depended on her parents after her divorce, Plaintiff cared for pets, performed household chores like cooking and laundry, and enjoyed doing art projects almost every day, including painting and making jewelry. (Tr. 84-54, citing Tr. 237-38, 241, 243). At the hearing, Plaintiff testified to more extreme symptoms, including crying, yelling, isolating herself, outbursts, difficulty concentrating, daily panic attacks, and mood fluctuations. (Tr. 85, citing Tr. 14-45; see Tr. 25-32). When compared to the overall record, the ALJ found these reports of the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 85).

While the relevant period did not start in this case until the filing of Plaintiff's application in June 2021, the ALJ considered records dating back to 1991, when a psychological evaluation was performed in the sixth grade, showing Plaintiff had an intellectual disability and emotional problems. (Tr. 85, citing Tr. 316-17). At a 2015 psychological evaluation (completed for a prior disability application) she presented calm, cooperative, and able to provide general information, and she reported being able to perform most personal care tasks and household chores. (Tr. 86, citing Tr. 668-71). The evaluation showed she had some difficulty with attention and concentration, her verbal comprehension was better than reading comprehension, and her short-term memory was better than her long-term memory. (Tr. 86, citing Tr. 668-70). While she struggled with mental computation, her social skills were adequate and her judgment and insight were fair. (Tr. 86, citing Tr. 670).

In treatment records from 2019, Plaintiff reported having a good response to her psychotropic medication, but her separation from her husband was a situational stressor that caused irritability, episodes with panic, and difficulty with memory and concentration due to the stress (Tr. 86, citing Tr. 729, 735, 741, 747). Still, Plaintiff felt better when doing chores, taking her

dogs for walks, and going to church. (Tr. 86, citing Tr. 747, 755). She moved in with her parents in 2021 when the problems in her marriage worsened. (Tr. 86, citing Tr. 346).

Treatment records from 2021 showed that Plaintiff reported anger, frustration, and stress at home stemming from her separation from her husband and with moving back in with her parents. (Tr. 87, citing Tr. 346-47). Mental status exams showed, however, that Plaintiff was calm, cooperative, had normal attention and concentration, normal memory, good eye contact, normal speech, normal thought process and thought content but below average intelligence, and fair insight and judgment. (Tr. 87, citing Tr. 346, 494). Her medications were adjusted to manage her symptoms better. (Tr. 87, citing Tr. 346-47, 494). These changes to her medication improved her mood, made her calmer and more capable of dealing with relationship stressors, and made her more interested in her daily activities. (Tr. 87, citing Tr. 490-91). Her reported symptoms increased when she was not fully compliant with her medications. (Tr. 87, citing Tr. 521, 523). Later in 2021, her provider noted that Plaintiff's mental status was stable, even when describing her anger over her marriage and living situation, and she appeared to use her diagnosis for bipolar disorder to "excuse emotive reactions and outbursts." (Tr. 87, citing Tr. 516).

While Plaintiff continued to report anger and outbursts in 2022, she began to show progress with removing herself from tense situations when she became upset with her mother, and agreed to try to spend more time with friends independently. (Tr. 87-88, citing Tr. 648, 654). Her mood also improved when in-person church services resumed. (Tr. 88, citing Tr. 651). She even expressed an interest in returning to part-time work, but Plaintiff reported her family and counselor apparently discouraged this because of the impact it would have on obtaining disability benefits. (Tr. 88, citing Tr. 1012). As an alternative, Plaintiff expressed interest in engaging in social activities, and her mother encouraged her to go to the gym for exercise. (Tr. 88, citing Tr. 1011).

Plaintiff's medication was changed at this time, and she had a good response—she presented bubblier in counseling, with an improved mood and reports of increased productivity and significantly decreased anger, and had a stable mental exam. (Tr. 88, citing Tr. 1000, 1006-08). Her therapist also noted she continued to show progress in coping with difficult emotions and communicating with family. (Tr. 88, citing Tr. 1002-04).

In early 2023, Plaintiff slipped on ice and experienced a compression fracture in her back; she missed therapy for a few months, and her symptoms deteriorated with mood swings, anger, and fixating on her life not going as she wanted. (Tr. 89, citing Tr. 993-94, 996, 999, 1025). Plaintiff's providers noted her thoughts seemed rambling, and she was preoccupied with negative thoughts; but she was still able to identify positive improvements in her life, such as maintaining a regular schedule, walking more, paying attention to personal care, and controlling her spending. (Tr. 89, citing Tr. 990).

Summarizing Plaintiff's reports, testimony, and longitudinal record, the ALJ explained that her daily activities included reading, walking her dog, and doing laundry when she was compliant with medication. (Tr. 90, citing Tr. 491). When she expressed a desire to gain more independence, she reported to her providers that her desires were barred by other influences. (Tr. 90). Nonetheless, Plaintiff had improvements in outlook, mood stability, and frustration tolerance when she was able to engage in the activities she enjoyed, stayed busy, and was independent of her family. (Tr. 90). Thus, the ALJ acknowledged Plaintiff's need for "exertional and non-exertional limitations to accommodate her severe impairments during the relevant period," but the evidence did not fully support the severity of her reported symptoms. (Tr. 90).

Concerning Plaintiff's second specific assignment of error that the ALJ failed to properly analyze the medical opinions, (Doc. No. 6 at 13-15), the Court finds the ALJ properly considered

the medical opinions in the record. (Tr. 90-92).[6] First, the ALJ found somewhat persuasive the prior administrative medical findings from two State agency psychological experts, Drs. Brian Grover, Psy.D., and Heather Bradley, Ph.D. (Tr. 90-91). Plaintiff's characterization that the ALJ "excluded their limitations related to her need for a 'stable, low pressure setting with limited interpersonal demands,'" (Doc. No. 6 at 13), is plainly incorrect. The ALJ included these precise restrictions—Plaintiff's RFC finding restricted her to a stable work setting ("she should avoid work environments with constant changes in a routine setting"), a low pressure work setting ("she cannot perform work requiring a production rate or demand pace"), and limited interpersonal demands ("[s]he can have frequent but not continuous, contact or interactions with supervisors, occasional contact or interactions with coworkers, and no public contact or interactions"). (Tr. 84). These experts found Plaintiff remained capable of simple, routine, repetitive tasks in a stable, low-pressure setting with limited interpersonal demands. (Tr. 90-91, citing Tr. 57-58, 64-65, 67-68). As the ALJ noted, these findings were supported by a review of the available records and consistent with the longitudinal record during the relevant period. (Tr. 90-91, citing Tr. 516-25, 648-65, 990-1024). In short, the ALJ's RFC assessment is wholly consistent with the State agency experts' findings—it limits social interaction with coworkers and supervisors and excludes all public interaction, and it limits Plaintiff to concentrating, persisting, and maintaining pace for two-hour periods over the normal workday while carrying out short, but uninvolved instructions and performing routine, repetitive tasks. (Tr. 84).

---

[6] Because Plaintiff filed her disability claim after March 27, 2017, the ALJ was tasked with evaluating how persuasive the medical opinions were by considering factors (supportability, consistency, relationship with the claimant, specialization, and a catch-all "other"), and explaining how she considered the most important factors of "supportability" and "consistency." 20 C.F.R. § 416.920c(a). "[S]upportability" refers to how well the medical source supported the opinions with explanation and objective medical evidence, and "consistency" to how consistent the opinions are with evidence from other medical sources and nonmedical sources. 20 C.F.R. § 416.920c(c)(1)-(2).

The ALJ also properly evaluated the opinions from Julie Pope Dantzler, M.S., a mental health counselor who treated Plaintiff as a teenager and young adult, but she did not treat Plaintiff at any point during the relevant period. (Tr. 91, citing Tr. 768). Ms. Dantzler opined that Plaintiff had marked to extreme limitations in all the mental functioning categories that prevented her from maintaining full-time work. (Tr. 91, citing Tr. 768-69). The ALJ found Ms. Dantzler's opinions unpersuasive, noting that they were not based on any treatment during the relevant period, and the summary of her past mental health history "offer[ed] limited insight into [Plaintiff's] current functioning," especially when compared to the treatment from other providers during the relevant period. (Tr. 91).

Contrary to Plaintiff's assertions, the ALJ did not "fail[] to acknowledge or discuss that she had treated [Plaintiff] off and on for 25 years." (Doc. No. 6 at 14). The ALJ explained that in her evaluation of Ms. Dantzler's opinion that she was Plaintiff's "long-time mental health counselor" and "treated [Plaintiff] off and on since 2003." (Tr. 91; see Tr. 768) (Ms. Dantzler stating she treated Plaintiff "off & on since 2003. Not currently seeing her."). But equally important, the ALJ explained that Ms. Dantzler "was not currently treating [Plaintiff]" and the record included no treatment notes more recent than 2016. (Tr. 91). Thus, the ALJ properly explained that Ms. Dantzler "did not treat [Plaintiff] at any point during the relevant period" and her opinions "offer limited insight into [Plaintiff's] current functioning." (Tr. 91). Furthermore, the ALJ had "extensive treatment notes available from current mental health providers" that reflected her "current functioning." (Tr. 91). Specifically, her current mental health providers encouraged her to be more independent with a part-time job or volunteering; these providers did not note that Plaintiff would be prevented from performing job tasks. (Tr. 91, citing Tr. 1012).

Finally, the ALJ properly evaluated Plaintiff's subjective complaints in the context of all

the available evidence. Contrary to Plaintiff's argument, the ALJ did not reject Plaintiff's statements concerning her symptoms. (Doc. No. 6 at 15). While the ALJ found the overall record showed Plaintiff's symptoms were not as severe as she claimed, she nonetheless partially credited Plaintiff's subjective complaints by incorporating multiple non-exertional limitations in the RFC finding. (Tr. 84-93).

When assessing a disability claim, an ALJ considers the claimant's alleged symptoms and assesses the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 416.929(a). The regulations set out two steps for this analysis. The ALJ first assesses whether there is objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 416.929(a); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); SSR 16-3p, 2016 WL 1119029, at *2 (S.S.A. Mar. 16, 2016). If there is, the ALJ then evaluates the intensity and persistence of the claimant's symptoms to determine their limiting effects. 20 C.F.R. § 416.929(a), (c). The ALJ does so by considering "all of the available evidence, including [the] medical history, the medical signs and laboratory findings, and [the claimant's] statements," assessing the extent to which the claimant's alleged functional limitations "can reasonably be accepted as consistent with" that evidence. 20 C.F.R. § 416.929(a). The ALJ also evaluates the claimant's "statements in relation to the objective medical evidence and other evidence," considering "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the] statements and the rest of the evidence." 20 C.F.R. § 416.929(c)(4). The claimant's alleged symptoms "need not be accepted to the extent they are inconsistent with the available evidence." Craig, 76 F.3d at 595.

As more fully discussed above, the ALJ thoroughly catalogued Plaintiff's reports and testimony of symptoms. While the ALJ agreed that Plaintiff's mental impairments were capable of producing the symptoms, she found Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were inconsistent with the overall evidence. (Tr. 89-90); 20 C.F.R. § 416.929(a), (c). In reaching this finding, the ALJ relied on substantial evidence, including Plaintiff's reported daily activities that included reading, walking her dog, and doing laundry; treatment records noting her improvement in outlook, mood stability, and frustration tolerance when she stayed busy and operated independently from her family; and improvement in her reported mood (with decreased anger) with medication compliance. (Tr. 89-90); 20 C.F.R. § 416.929(a). Still, the ALJ did not reject her symptoms in the RFC finding. (Tr. 84, 92-93). Instead, the ALJ's RFC finding addressed Plaintiff's intellectual disorder and slow processing speed (i.e., carrying out short and uninvolved instructions to perform routine, repetitive tasks); difficulty with remaining on task and being interrupted by her mental health symptoms (i.e., no production rate or demand pace work; remaining on task for two-hour increments); irritability and anxiety around large groups of people (i.e., frequent supervisor contact, occasional co-worker contact, no public contact); and difficulty adjusting to changes in routine or schedule (i.e., no work environments with constant changes in routine work setting). (Tr. 84, 92-93).

In light of the entire record, the ALJ found that Plaintiff established the basis for multiple non-exertional limitations. (Tr. 92-93). To address her intellectual disorder and slow processing speed, the ALJ restricted Plaintiff to carrying out short, but uninvolved instructions to perform routine, repetitive tasks. (Tr. 92). So long as the work was low stress, not requiring a production-rate or demand pace, the ALJ found Plaintiff could perform her tasks in two-hour increments throughout a normal workday. (Tr. 92-93). In addition, the ALJ acknowledged that her irritability

and anxiety increased around large groups of people, so she limited Plaintiff to no public contact. (Tr. 92-93). Still, Plaintiff had a good rapport at her treatment appointments, and could therefore tolerate frequent contact with supervisors and occasional contact with co-workers. (Tr. 93). As for her reported difficulty in tolerating changes to her routine or schedule, the ALJ restricted her to work settings that did not constantly change, to prevent the exacerbation of mental health symptoms. (Tr. 93). Finally, the ALJ considered, but rejected the additional restrictions suggested by Plaintiff's representative (i.e., time off task, absenteeism, additional social limitations, and limited math abilities), explaining the longitudinal record did not support the inclusion of these restrictions. (Tr. 93, citing Tr. 304-06).

Here, the ALJ's thorough RFC assessment explains why Plaintiff's "moderate" mental ratings from step two do not prevent her from performing work-related functions, and referenced evidence that supports that finding. See Shinaberry v. Saul, 952 F.3d 113, 121–22 (4th Cir. 2020). When, as here, the basis for the residual functional capacity finding is reasonably discernible, there is no error. Id.; see also Sizemore v. Berryhill, 878 F.3d 72, 80-81 (4th Cir. 2017) (affirming where consultants' opinions provided "substantial support for the ALJ's finding"). Ultimately, Plaintiff disagrees with how the ALJ weighed this evidence, but weighing conflicting evidence is quintessentially the province of the ALJ, not a reviewing court. See also Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) ("In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ].") (citing Craig, 76 F.3d at 589); Shelley C. v. Comm'r of Soc. Sec. Admin., 61 F.4th 341, 353 (4th Cir. 2023) (quoting Johnson).

The ALJ applied the correct legal standards. Substantial evidence supports her formulation of Plaintiff's RFC and ultimate conclusion that Plaintiff could perform work that existed in the national economy and, therefore, was not disabled.

### III. ORDER

**NOW THEREFORE IT IS ORDERED:**

1. The Commissioner's decision is **AFFIRMED**.

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED.**

Signed: September 30, 2025

Susan C. Rodriguez
United States Magistrate Judge